This wouldn't be fun by comparison. I'm going to ask you on behalf of Barbara Lester to reserve two minutes before we vote. This is a simple yet extraordinary case involving a guilty plea colloquy for a mentally ill woman. And the latest set of statistics we've been able to find, the Sentencing Commission stated that 96.5% of all defendants proved guilty. With this overwhelming percentage, it goes to the heart of the criminal justice process, it goes to the heart of the process which is due that a plea be knowingly and voluntarily uttered. And that was the vice in this case. This case is about due process. It's about the process which is due both at the change of plea colloquy and the process which is due at time of sentencing. The safety net in this case, established by not just Rule 11 but the Due Process Clause, and this is a due process case, failed. This court, as it's aware, took the lead way back in 1987 in determining and establishing what questions should be asked and what statements should be elicited when an individual says they are subject to either, in that case, narcotic drugs or later decisions which follow the Third Circuit with prescription medication. And this court established a specific set of tests that you must ask probing and obtain responsive answers to those probing questions to determine whether the drugs the defendant is under that day or taking have affected or do affect their ability to plead knowingly and intelligently. And this is your argument, that the district court did not ask enough questions. That is your part of our argument, Your Honor. Well, you're not arguing that the medications your client was under were affecting her at the guilty plea. You're not arguing she didn't understand what was going on or did not appreciate the consequences of her plea. You are arguing, as I understand it, that the district court should have asked more questions. What is the other part of that argument? We don't think we're limited to that, Your Honor. We believe you're arguing that the entire plea, qualically, was defective. That it was defective, that she did not understand what she was answering. And we get into that with the counts she said she was not guilty of, in various counts of the indictment. She didn't say she was not guilty of them. Excuse me? She didn't say she was not guilty of them. That's correct. She didn't use those words. She used words which undercut the intent for the three counts of the instruction. Let's restrict ourselves, though, to the part of the colloquy that had to deal with the medications that she was taking. At the Rule 11, you quote several times in your brief the beginning part of the colloquy. Did you take any medications this morning? I took two. What did you take? Two Ativan. You very often, as you quote this section in your various papers, don't ask the next question that the court asked. Well, a couple of times you skipped this one. Does the taking of this medication affect your ability to understand and appreciate what is taking place in this courtroom this morning? And she says, it just puts me in perspective. And then she says, I understand. Is there anything ambiguous about that? Yes, we think there is. Putting you in perspective. It's an antidepressant she's taking, that particular drug. And the statement that it puts you in perspective we think is more than ambiguous. Then she says, she understands. But if you follow the colloquy, she doesn't understand. The vice here was Well, wait a minute. But you see, there's more colloquy that you don't often talk about. The judge then says, when you say puts you in perspective, answer, calms me down. So that you can deal with the circumstances? Yes, Your Honor. And then this question, which doesn't appear except once. Very well. Are you presently under the influence of any drugs or medication or alcoholic beverages of any kind other than the two you've indicated that you've taken this morning? And the answer is no, sir. The vice of the question is, he doesn't ask the right question of due deference to the trial judge. He should have asked, what happened to the other eight pills that she said she took every day? And there was no questioning about the other eight pills. And she lays out the nature of the drugs, which are major anti-psychotropic medications. He asked the court to take judicial notice of the PDR, of what those drugs can do. In fact, if the court could ask about the other drugs, and had taken even a moment of time to look them up, you would notice that Ativan shouldn't be given with Lexapro. Because it shouldn't be given in a major, where there's a major mental illness. A major depressive disorder, which everybody agreed to occur here. But beyond that, your honor, three pages into the colloquy, it's clear she's not following what's going on. Three pages into the colloquy, the court asks her specifically, do you understand you have the right to pursue and maintain your plea of not guilty? And she says, yes, sir. Again, you can argue the court should have been asking you these questions, but leave it outside. And she says, yes, sir. But that's a standard question in Rule 11. Yes, but when you have a woman with a major mental illness, our view is, you should be soliciting answers, not just asking her yes, sir questions. In the ideal world, if my father had been king, I might be queen of England to get today. But, I mean, this is like Rule 11. This is the standard questions that are asked in every Rule 11. There was no reason to believe this woman didn't understand them. It's not really even been alleged, even today, that she didn't understand what was going on, until today. Your Honor, quickly. That she wasn't competent to plead guilty. I think it's clear from our briefing, and reply brief in particular, that we've been taking a broader position since the beginning. We're not limited to a series of five or six questions at the beginning of the colloquy. And I'm arguing that. Look, it is plain and reviewed arguments. We understand that. But we're taking a broader view. And you can tell two pages into that colloquy when they ask her, do you understand you have a right to pursue and plead not guilty? She says, yes, sir. And the court says, what did I just say? And she answers, I can't withdraw my guilty plea. And the alarm bell should have gone off by that point, when she says she cannot follow the questions the court is asking. And two pages later, when you get to the specific colloquy about Counts 19, 20, and 21, and she starts answering at that point, I didn't know his name was in the address book. And her lawyer says in response to those counts, she can't remember what she said. But I'm satisfied that she must have said it. One of the side effects of these medications, if you had a colloquy, is worse than memory. But she had also just said everyone's name and address was in the book. Excuse me? She had just said that everyone's name and address was in the book. And that's part of the bias of the colloquy. She's contradicting herself in the colloquy internally. For instance, at the end of the colloquy, and the governor will prove this out, the governor's pre-plead memory was adopted as a stipulation of fact. The problem with that was it contradicted what she just said five or six pages earlier in the colloquy. And then you can't rely on her in these circumstances. The governor wants you to look beyond, Your Honor, obviously, look at the medical history and what's in the record to try to affirm this. But when you look at the medical history, you have clear indications from the doctors who treated her that she suffered from a major mental disorder. The medication impairs her memory. That's Dr. Sadoff in the record. Dr. Michaels in the record noted she had changed her medical regimen, so whatever she was taking in December doesn't necessarily show whether she was competent or not competent in her plea back in September. Dr. Boyce and the governor left this one out of their quote, said she had serious problems with concentration and attention span. That couldn't be any clearer. That's from Dr. Boyce, the defense expert, who did start to treat her right around September and said at that point she was sliding into psychosis. In our view, it's a simple case. But the doctors all agree she was not psychotic. No, that wasn't clear either in our view. Even Dr. Michaels said that paranoia should be considered as a possible diagnosis. He was questioning that at the sentencing hearing, but he said that should be considered. But this goes back to September, and that's the vice of trying to retrospectively take a look at what the competency was on this kind of a record, and that's why the McCarthy court and this court have said the case ought to be remanded for Luke Biggery. With that, let me at least get to briefly the other arguments. With respect to counts 19 to 21, the government's response to her equivocal responses, in effect responses that she did not intend to commit the crimes, was to cite North Carolina v. Alfred. We found that to be an astonishing response. An astonishing response. That taking the death penalty case, where somebody works out an agreement to take the death penalty off the table by agreement of the parties, satisfies the government's burden here. This was not an Alfred plea. Correct. It was no plea agreement at all. It can't be an Alfred plea. There was no plea agreement at all. I think the government was analogizing to Alfred. I don't think they're saying... I don't think they're saying analogizing. They're saying this was an Alfred plea. No, no, because they say you have to have permission out of Washington to do an Alfred plea. They didn't have it. So by definition, it couldn't have been an Alfred plea. I think you said that, Your Honor. You said that. It couldn't have been an Alfred plea. By any stretch of the mountain. You're absolutely right. We should not be... The government is normally the one to jump up and down and say they defended, should not be pleading guilty if they say they didn't commit the elements of the offense. Here they're taking the opposite position, which we found an astonishing argument. Let me get to the sentencing itself. The district court that you project here sentenced the defendant before this court's elucidation in Cooper and before this court's en bas decision in Greer. Let me break the bed, if I can, quickly. The governor's argument is somehow it's plain over review to appeal the reasonableness of a sentence. We think on this record it's clear, based on the Greer decision, that that's sufficiently preserved. The vice with this sentencing was the court thought he was operating under the guidelines. My hands are significantly tied in reference to alternatives. Court, you would have... Defense counsel, you would have reference to impose any sentencing appropriate court, that's if I find diminished capacity. At the sentencing itself, the court finds these advisory guidelines are appropriate when we consider their totality and uniformity in sentencing throughout the U.S. He thought he was bound by it. Once he found there was no departure for diminished capacity, he gave a 51-month sentence. And the other major price was the restitution order. The restitution order was $938,000 a year, with no finance on the record about ability to pay. We asked this court to adopt the Day decision of the Second Circuit, which we think elucidates how the court should consider the interplay between 3363, 3368, and 3363. The restitution... I don't want to keep asking you a lot of questions because the time is limited, but the probation officer in the PSI made it very clear that they could sell real estate, that there could be a lump sum payment. There was never an objection made to the pre-sentence report on that ground, and the district judge adopted those findings. That's why the judge, Justice Alito, said there had to be findings about a financial ability to pay because if you look at that financial statement, out of the assets, it's supposed to be had, they were listed as joint assets, $150,000 was cash. You have to consider the financial ability. But there was no record, nothing on the record. You had to consider it. And if you considered it, if you want to bear for a second, out of $150,000 of cash, all except $3,000 is the husband. If you even consider all the joint real estate and what she was making and what she would have been taking home and what she was making, it's all his money. Even if you consider that net worth, which is about half a million left, you take half of that. That's what you take. So that's a quarter million. He would have almost a million dollars of restitution for a woman who didn't get a nickel. Are you saying that reasonableness is a standard for mandatory restitution? We're saying under the Dave decision, Your Honor, the court should first determine the financial ability to pay first. Yes, before it becomes mandatory and then go back to the assets again to determine a payment schedule which is fair based on the assets of the party. I assume my time is up at this time. If there are no other questions, we rely on the remaining arguments in the brief, and I'll pick up where we left off. Thank you. Thank you. Please, Winter. Good morning. My name is Nancy Bean Winter, and I represent the United States in this matter. And picking up with the court's point, Judge Barry, that is the government's contention here that it is fatal to the defendant's claim here today that he is not, in fact, claiming any error affecting a substantial right of this defendant, rather he relies on a purported absence of something by the district court to say, to turn that into a substantial right defect. Well, I watch both briefs kind of segue into a competence to plead guilty. They start on the knowing and voluntary nature of the guilty plea, and they segue into the competence, whether she was competent to plead guilty. And I think that has been injected into the case in the briefing. And I think injected in only because the law requires the district court, if it finds cause to have a competency hearing, then he need do so. And the briefing and the amplified record that we have here that isn't just the day of the plea, but is two additional days, and very lengthy and very, very deep back and forth. This is not, this is no glib hearing where it's short. This is a very in-depth proceeding where we're looking at the entire record. The reason we go into that is, from the government's perspective, those entire long three days show a complete absence of any lack of competency by this defendant. Or to not say a double negative, she's competent, and there's nothing in the record that shows the contrary. Well, whether she was competent in the sentencing hearing does not answer the question of whether she was competent at the Rule 11. That's true. However, when a silent defendant claims error by a district court in the course of a hearing, the entire record is open for the court's review to assess that. And in the sentencing hearing, which is actually two days long, there's a day allocated entirely to the departure motion by the defendant, and then the sentencing hearing, there are extensive medical records from three people who reviewed the defendant, who talked to the defendant, who asked lengthy and very deep and probing questions of the defendant. And in every one of their reports, they all conclude the component parts of competency, those pieces that say a defendant's competent. Memory, intelligence, recollection, oriented to time and place, responsive. Doesn't the district court have some obligation to inquire into the medication she was under at the guilty plea other than the Ativan? I would suggest that the district court did that by saying, how do these medicines affect you? Medicine, quote. Now, I understand that after the fact with the counsel who wasn't present and didn't know the defendant and wasn't a party to the proceedings, is now looking at a dry record trying to impart uncertainty. But having been present, I don't think there was uncertainty there. And when the defendant responded as she did... Well, I think it's not so much trying to impart uncertainty. I think the counsel invokes para-Ibanez. Yes, but this is different. Why is it different? Para-Ibanez does not control this because in that case, that court didn't ask the critical question that this court did. This court asked the critical question of, how do these medicines affect you? And then there was a conversation about what they did for her. They helped make me even. I understand. They helped me calm down. In para-Ibanez, the court simply inquired about one medication and said, oh, is that a nerve medication? And the response was yes. It didn't ask, how does that medicine affect you? Well, it said calm nerves, but... The bigger difference in para-Ibanez, I think, was that that same district judge the week earlier had had a hearing in which the defendant testified he was suicidal, he was on cocaine, and he was on heroin. And he had prior head injuries, I believe. I don't know. The court even said in para-Ibanez that prior competency hearing, the necessity for it, alerted the court to the issues. There was no alerting to this district court. There was any issue anywhere. Through the three-day lengthy hearings, through the months of experts who saw this, her own counsel, there was never a question on this record that this defendant was not confident. And the court, although perhaps he could have asked more questions, asked the pivotal question, which is, how did these medicines affect you? And there's then a conversation where she says, I understand. They calmed me down. And then there's a very lengthy conversation where the defendant isn't just saying yes and no. She's partaking in a conversation with the court, even at times disagreeing with certain facts in the record. This is not someone who isn't following, understanding, and participating knowingly. Disagreeing with the facts. Why don't you get to that? And why not counts 19, 20, and 21 stand? Also, if you could address the district court's consideration, or lack thereof, of the 3553A factors. Okay. Addressing the first issue, and then I'll get to the sentencing issue next. This court, the Third Circuit, has already decided that a defendant need not be in a court with every factual element that makes up the crime. In Trott, this case said, a defendant, even disagreeing with the factual basis, can enter a plea. And that's what the government suggested as it's occurring in this case, is that the defense counsel is mixing up what it takes to have a knowingly intelligent plea with an adequate factual basis. There was an adequate factual basis in this case. There is no doubt at all. What the defendant does is quibble with some of the, what she claims should have been the interpretations imparted to her actions. For instance, the throwing of the book into the trash can. Well, set it in the facts. It certainly would have been adequate for a jury to find that, based on the fact that she'd been told she was under investigation, told who she was under investigation for, she denied even knowing that person, denied any impropriety, she was told she was being escorted off the compound and would not be let back in, and to only take personal items. In that context, Ms. Lesner then goes to her office, opens a locked cabinet, takes some of the files that were involved in this case, puts them on her desk, takes her personal items, and then throws the government appointment book into the trash. Upon leaving, immediately gets on the phone and tells an employee, take the files off my desk. Under those set of facts, it is a jury could clearly infer the intent to distort evidence as charged in that case. The fact that Ms. Lesner says, well, I wasn't coming back. Well, she may have said that, but the facts were to the contrary. She stipulated to those facts. From those facts, the crime could be found. And when the ultimate question was asked of her, do I plead guilty? She said yes. Do we have to go to the stipulation to find that there was an adequate factual basis for 19 through 21? I believe so. Yes. And she stipulated that it was, in fact, correct. But... Can I just modify that answer? Just a minute. She also said she didn't know this fellow's name was in the address book. Right? She denied that. That's what she claimed. Well, is there any evidence to the contrary that she did know? Yes. Was that in the stipulation? Yes. Or somewhere else? Yes. The personal... I mean, there was a great deal of evidence that showed about the personal relationship between these folks. No, no. I think Judge Tashima's question is more direct than that. And I suppose the answer could be it was her statement at the guilty plea colloquy that everyone's name and address was in the address book. Yes. I apologize for misunderstanding that question. But... I wanted to modify my answer, though, because it was related to 20 and 21. Even... That's the other... The different... That's not the address book. That's the phone call to destroy records. Even under the defendant's best-case scenario, she does acknowledge she called that employee and told her to remove files. She just now says, I don't remember telling her to destroy them. The removal is more than adequate to make out those two charges. The destruction wasn't necessary. It's just one of the... But the facts show that... In fact, the co-worker testified at the sentencing hearing as well. Exactly. Yeah. And the evidence supported... Would have supported that despite her quibbling with saying, I don't remember saying destroy it. I just remember saying remove it. So the stipulated facts weren't necessary for that, but are there. Now, moving on to your question, Judge Chigares, there is a more than ample basis that even though this court conducted this hearing prior to this court's guidance in Cooper, that this court did, in fact, comport with the spirit of it by addressing all of the issues involved, all of the 3553E factors. And they really are lengthy. And I think in this context, what defense counsel is suggesting is necessary is some kind of rogue recitation. It's not. What the record needs to show is simply that the court did, in fact, consider all of these factors. And I would suggest... Well, your repertory points out that really the only comment is that the guidelines are advisory. And is that enough here? Well, I suggest the court did much more than that. The court repeatedly discussed the fact that the guidelines are advisory, but nonetheless indicated its awareness that nonetheless, as a starting point, the guideline range is a necessary component. But defense counsel, I think really what the gist of their argument isn't so much that the court didn't consider it, but the court didn't accept it and as a result depart. It is very clear from this record that this court did consider the defendant's exemplary work record. The fact that she had no financial benefit from the crime. The fact that she did have a mental depression state at present, although we found it was not the motivating force behind her crimes. It didn't exist until after she was facing indictment and the stress of the instant offenses. The record is very clear and it starts... I don't want to do too many case sites and record sites, but I actually have a list of them. And starting on page 78 of the government's brief, it is a litany of them. It talks about the history, her mental health. He also makes it very clear as it relates to mental health, contrary to what defense argues, that even though the court found it did not rise to diminished capacity, that he nonetheless considered it. And he did so at the record at 473. He spoke at length with the defendant herself for some 10 pages. He talked about her contact with her husband. He talked about so many issues with this defendant and in the course of this two-day hearing that to suggest simply because at the end of it he didn't do some kind of mechanical recitation of the facts he considered really ignores the reality of the two-day hearing where he engaged with the experts, with the husband, with the defendant, with the witnesses about all of these component pieces that make up the 3,503 facts. And the more you do, the more possibility there is for error. So that I ask you, what did he mean, do you think, when he said with respect to the district court judge, with respect to imposing alternative sentences that the court's hands were significantly tied? You have to put that in context. When the judge says that, he's talking to the defendant's husband. And that's at page 418 in the record. And what he's saying to the defendant's husband, and he has a 3 to 4 to 5 page discussion with him, he starts out by saying to the defendant's husband, Sir, you understand this is a very serious offense. It affects the very integrity of government purchasing. This went on for a very long period of time. He's almost explaining to the husband why we are at the guideline range we're at. Yes, the guidelines are advisory, but these are very serious offenses. And then there's back and forth. And ultimately it concludes with the judge saying to the husband, Sir, my hands are significantly tied. They're tied within the bigger context. He was going to send her to prison anyway because of how he viewed the crime. How he viewed the crime and the fact that the recommended guideline was 51 to 63 months. And the husband had just been saying, please do something so she doesn't have to go to jail. So to have that result would be a departure so extreme it would be well outside the parameters of appropriate sentencing. I suggest that is the context within which the district court made that comment. He did not ever evidence any indication throughout this long record that his hands were tied, that he had to do a 51 to 63 month sentence. To the contrary, at one point he says to the government, Government, what would be inappropriate about giving a three year sentence in this case? And it shows he's considering options. Well, that's what he was considering in acceptance, the possibility of acceptance of responsibility. That exactly was my point. I said that would reflect the reduction that's commensurate with giving her acceptance. But my point is that in the course of this lengthy record, the court recognized the advisory nature of the guidelines, used the 51 to 63 months as a starting point, and then considered every single thing the defendant said Their complaint today simply is that he didn't accept them. And when you look at this record, there's really good reasons why this district court didn't accept some of the departure requests. In fact, in sentencing, the defendant gave her the very, very bottom of the guideline range. I would suggest that it is by no means an unreasonable sentence that the defendant bears the burden of shock. I'm sorry. Let me ask for your position on this. The denial of the acceptance of responsibility adjustment, the only reason district court gave was this was not an extraordinary case, which to me means that he denied it because she was convicted of this obstruction of justice conviction. Is that the way you read it? That actually is not the way I read it because I read that conclusion as coming on the heels of an entire discussion about... He started out the sentencing hearing with should she get acceptance? And then there was the back and forth for literally hours about that very issue. But what the judge finds at the very end is under the totality of the circumstances is what the district court actually uses the phraseology at that point. I do not find this to be an extraordinary case. And I suggest that when you're talking about the totality of the circumstances, you're talking about the entire day spent discussing this defendant where you had a district court who acquired of family, of co-workers, of other people. Could you help this person? Exploring all the areas about why this defendant did or didn't do the right thing. My problem is he seems to believe that this has to be an extraordinary case in order for her to be entitled to acceptance of responsibility. And the only cases where it has to be extraordinary is where it's initially denied because of some enhancement for obstruction of justice. And this is not such a case. You can answer that. Thank you. The guidelines note that where obstruction is found and it was found here in... Not found where there's an enhancement due to obstruction.  Yes, there was. No? What was the enhancement? There was an enhancement for obstruction in this case, Your Honor, based on the crimes counts 19, 20, and 21. Well, there was no exempting for those crimes, but there were no enhancements based upon obstruction. No, I believe there was. I believe in the PSR. It did give a two-level enhancement for obstruction to which the defense did not object to, notably. And the only error they claimed ever on the record below is the failure of the court to give the three points or two points for acceptance. But there did coexist an enhancement for obstruction. And as such, the starting point is an examination of whether those two should coexist as the guidelines envision them. And this record, I would suggest, shows very clearly this district court found they should not. But that's in the PSR? That is in the PSR, yes, sir. All right. If it is, I'm fine. Thank you. You're welcome. Thank you. Thank you very much. Is it final? Let me start by saying this. While the government keeps arguing, based on the record, that there was consideration, there was no meaningful consideration. The only thing the court said out loud, and that's the difficulty, and what this court was getting at in Cooper in its later decision in Greer, was that something on the records of the court could follow what the district court did below.  All you can tell from this record was, my hands are tied, that the sentencing commission did an authoritative, detailed analysis of the guidelines in setting them, and, therefore, I'm not the first. He doesn't say, by the way, he doesn't say one word in terms of departure, even though the probation report said a departure should be considered for employment history, 25 plus years in the same job, and a departure should be considered because restitution, the court, the probation office of the court was mandatory, we disagree with that under Dan, but the probation office of the court was mandatory, and you're ending up with almost a billion dollar restitution where, for a moment, it was making $40,000 to $50,000 a year, you know, before taxes, and most of the assets are a husband, and there's not one word on this record about even the most precautionary issues. Let me go back to the plea column. Again, we think the briefing picked up both the words themselves on the initial inquiry about the drugs, plus the broader issue of competency, and when the court looks at that transcript, and she can't follow, and he's asking her questions, and she says, what did I just say? You can't follow that. That's a significant part of the conflict. We also disagree strongly with this court's view of the power of evidence. We think that's a stronger case for the government than you. He did, the judge did have a competency brief. The judge did ask the defense on the record, do you understand what's going on today? He said yes. The judge did ask counsel on the record, are you satisfied with the comments? And despite all that, the court still said it was insufficient, and here we have a very serious matter on this, no question about that, very serious medications, antipsychotropic medications, and it just doesn't need to process. I leave the court with this, Adam McCarthy. It is not too much to require that before sentencing defendants to years of imprisonment, district judges take a few minutes necessary to inform them of their rights and to determine whether they understand what they are taking. That's all we're asking here. This colloquy was deficient. The case will be remanded for a new plea colloquy, and alternatively released for new sentencing. We appreciate the court's time and attention. Thank you. This case was extremely well argued, both sides. We very much appreciate it. We will take it under advisement.